## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Britt Wallace,

                    Plaintiff,

        v.

SANOFI-AVENTIS U.S. LLC; SANOFI US
SERVICES INC.; CHATTEM, INC.; PFIZER.
INC.; GLAXOSMITHKLINE, LLC and
BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

                    Defendants.

**COMPLAINT FOR DAMAGES AND
DEMAND FOR JURY TRIAL**

**CASE NO.: 1:20-cv-00623**

Plaintiff, by and through undersigned counsel, hereby brings this Complaint for damages against Defendants, Boehringer Ingelheim Pharmaceuticals, Inc., Chattem, Inc., GlaxoSmithKline LLC, Pfizer, Inc., Sanofi-Aventis U.S. LLC, and Sanofi US Services, Inc., and alleges the following based on personal knowledge, the investigation of counsel, and information and belief:

## INTRODUCTION

1.      Plaintiff brings this suit for damages suffered as a direct and proximate result of the Defendants' violations in common and statutory law and their negligent and wrongful conduct in designing, developing, manufacturing, testing, packaging, promoting, marketing, advertising, distributing, labelling and/or selling of the drug Zantac (also generically known as ranitidine), which was defective, dangerous to human health, and lacked proper warnings on the label.

## PLAINTIFF

2.      Plaintiff Britt Wallace is a citizen of Colorado and resides in El Paso County, Colorado.

1

3.      Plaintiff brings this action for personal injuries sustained as a result of his use of Zantac. Plaintiff first began using Zantac in or around the year 2014 and regularly used Zantac for 5 years. Plaintiff is 57 years old.

4.      Plaintiff took 150 mg of Zantac twice daily.  Plaintiff generally purchased Zantac at Dollar Store, Wal-Mart and Walgreens locations in Colorado.

5.      As a result of Plaintiff's use and ingestion of Zantac, Plaintiff developed and was diagnosed with kidney cancer in February of 2020. Plaintiff is undergoing treatment in Colorado Springs, Colorado.

6.      If Plaintiff had known that ingesting Zantac would expose him to extreme levels of NDMA and additional health consequences, he would not have purchased and/or used the drug.

## DEFENDANTS

7.      GlaxoSmithKline LLC is a Delaware corporation that has its principal place of business in Philadelphia, Pennsylvania and Research Triangle, North Carolina. GSK is a wholly owned subsidiary of GlaxoSmithKline PLC, a British limited company that is registered to do business in the United States. GlaxoSmithKline PLC was the first company to apply for and receive approval for prescription brand Zantac. GSK, until recently, sold over the counter versions of Zantac.

8.      Pfizer, Inc. is a Delaware corporation that has its principal place of business in New York, New York. Until 2006, Pfizer held the U.S. Right & New Drug Application ("NDA") for manufacturing, marketing, and selling over the counter Zantac.

9.      Boehringer Ingelheim Pharmaceuticals, Inc., is a Delaware corporation that has its principal place of business in Ridgefield, Connecticut. Boehringer is a subsidiary of the German company Boehringer Ingelheim Corporation. Between 2006 until 2017, Boehringer owned the

U.S. rights to over the counter Zantac. During that period Boehringer manufactured and distributed the drug in the United States.

10.     Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation that has its principal place of business in Bridgewater, New Jersey. It is a wholly owned subsidiary of the French company Sanofi S.A.

11.     Sanofi US Services Inc. is a Delaware corporation that has its principal place of business in Bridgewater, New Jersey. It is a wholly owned subsidiary of the French company Sanofi S.A.

12.     Chattem, Inc. is a Tennessee corporation that has its principal place of business in Chattanooga, Tennessee. It is a wholly owned subsidiary of the French company Sanofi S.A.

13.     Sanofi-Aventis U.S. LLC; Sanofi US Services Inc.; and Chattem, Inc. (collectively "Sanofi") controlled the U.S. rights and NDA to over the counter Zantac from 2017 to the present. During that period, Sanofi manufactured and distributed the drug in the United States.

## JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1332, this Court has diversity jurisdiction over this action because the amount in controversy exceeds $75,000, exclusive of interests and costs, and because Plaintiff is a citizen of a state different from any defendant.

15.     This Court has jurisdiction over supplemental state law claims pursuant to 20 U.S.C. § 1367.

16.     This Court has personal jurisdiction over Plaintiff as he agrees to submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants, as they conducted substantial business in the District; Plaintiff's claims arise out of Defendants, directly or by an agent, operating, conducting, engaging in, or carrying on a business in this state or having an

office or agency in this state, committing a tortious act in this state, and Defendants were engaged in solicitation or service activities within the state which were used or consumed within the state in the ordinary course of commerce, trade, or use.

17.     Venue properly lies in the District pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this District, Defendants' actions have caused harm to Plaintiff who resides in this District, Defendants regularly conduct business in the District, and are subject to personal jurisdiction in the District.

## FACTUAL ALLEGATIONS

### A. Zantac's History

18.     Zantac is a histamine 2 blocker, which is a class of medications that block a type of histamine, one of many stimulants of acid production in the stomach.[1] Histamine 2 blockers prevent or relieve heartburn by reducing the production of stomach acid.[2] Zantac's main active ingredient is ranitidine.[3]

19.     Zantac was developed by Glaxo (now GlaxoSmithKline) and introduced to the market in 1981.[4] Zantac's prescription use was approved by the FDA in 1983[5] and prior to its FDA approval, Zantac was approved in 31 different countries.[6]

---

[1] *Frequently asked questions*, Zantac (last visited Dec. 5, 2019), https://www.zantacotc.com/zantac-FAQ.html
[2] *Id.*
[3] *Id.*
[4] https://www.worldofmolecules.com/drugs/zantac.htm
[5] Richard Wright, M.D., *How Zantac Became the Best-Selling Drug in History*, 16(4) J. HEALTHCARE MARKETING 24 (Winter 1996).
[6] *Timeline- Popular heartburn medicine Zantac pulled off store shelves*, CNBC (Oct. 2, 2019), https://www.cnbc.com/2019/10/02/reuters-america-timeline-popular-heartburn-medicine-zantac-pulled-off-store-shelves.html#:~:targetText=Zantac%20becomes%20the%20world's%20best,%241%20billion%20in%20annual%20sales.&targetText=Glaxo's%20U.S.%20patent%20for%20ranitidine,generic%20alternatives%20to%20the%20drug.

20.     Zantac has been sold over the counter since 1995. When sold OTC, Zantac is available in 75 mg and 150 mg tablets. With a prescription, consumers are also able to obtain 300 mg tablets.

21.     In 1988, just a few years after its development, Zantac became the world's best-selling drug and one of the first drugs to top $1 billion in annual sales.[7]

22.     At all relevant times, Defendants touted the safety of Zantac and thus Zantac's success continued to soar over the years. In 2018, Sanofi reported that Zantac brought in 127 million Euros in net sales around the world, with sales in the U.S. constituting 113 million Euros of the total.[8]

23.     Since the time of its development, the U.S. rights to Zantac have changed hands numerous times. GSK was the original inventor of Zantac and had the prescription rights to Zantac from 1983 through 2009. After GSK's patent for ranitidine expired in 1997, many competitors launched generic alternatives.[9]

24.     In 2004, Pfizer received FDA approval to sell Zantac over the counter in the U.S.[10] After Pfizer, the brand changed hands from Boehringer Ingelheim Pharmaceuticals to Sanofi.[11] Until its recall of the product in October 2019, Sanofi sold branded over-the-counter Zantac.[12]

---

[7] *Id.*

[8] Sanofi, Form 20-F, Annual Report Pursuant to Section 13 0r 15(d) of the Securities and Exchange Act of 1934 for the fiscal year ending December 31, 2018, 2018 Consumer Healthcare net sales by geographical regions at 97. https://www.sanofi.com/-/media/Project/One-Sanofi-Web/Websites/Global/Sanofi-COM/Home/common/docs/investors/Sanofi-20-F-2018-EN-PDF-e-accessible_01.pdf

[9] *Timeline- Popular heartburn medicine Zantac pulled off store shelves, supra* footnote 42.

[10] *Id.*

[11] *Id.*

[12] Michael Erman, *Sanofi Pulls Zantac from U.S. and Canada after carcinogen found*, Reuters (Oct. 18, 2019) https://www.reuters.com/article/us-sanofi-heartburn-zantac/sanofi-pulls-zantac-from-u-s-and-canada-after-carcinogen-found-idUSKBN1WX1WU#:~:targetText=Sanofi%20has%20sold%20over%2Dthe,generic%20versions%20of%20the%20drug.&targetText=Other%20drugmakers%20including%20GlaxoSmithKline%20and,their%20versions%20of%20the%20drug.

### A. **NDMA – A Known Carcinogen**

25.     According to the Environmental Protection Agency ("EPA") "NDMA is a semi volatile organic chemical that forms in both industrial and natural processes," and "[it] is not currently produced in [its] pure form or commercially used in the United States, except for research purposes."[13]

26.     Numerous organizations, including the FDA, EPA, the International Agency for Research on Cancer ("IARC"), and WHO, have classified NDMA as a B2 (probable human) carcinogen.[14] NDMA acts as a carcinogen because it modifies DNA.[15]

27.     The WHO stated that "NDMA consumption is positively associated with either gastric or colorectal cancer" and that "there is conclusive evidence that NDMA is a potent carcinogen in experimental animals by several routes of exposure." [16]

28.     The International Agency for Research on Cancer found that "there is *sufficient evidence* of a carcinogenic effect of *N*-nitrosodimethylamine in many experimental animal species… *N*-nitrosodimethylamine should be regarded for practical purposes as if it were carcinogenic to humans."[17]

29.     Since the 1980s, the FDA has directed manufacturers to recall products containing unsafe levels of NDMA. Just last year, there were recalls for several drugs containing the active

---

[13] Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA), Environmental Protection Agency (Nov. 2017), https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf
[14] *Id.*
[15] Dr. Sejal Parekh & Dr. Tulsie N. Patel, *The Zantac Problem: What's NDMA,* ABC News (Sept. 23, 2019), https://abcnews.go.com/Health/zantac-problem-whats-ndma/story?id=65799147
[16] World Health Organization, *N-Nitrosodimethylamine (NDMA),* GUIDELINES FOR DRINKING WATER QUALITY (3rd ed. 2008) https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf
[17] *N-Nitrosodimethylamine*, International Agency for Research on Cancer- Summaries and evaluations (last updated Mar. 27, 1998), http://www.inchem.org/documents/iarc/vol17/n-nitrosodimethylamine.html

ingredient valsartan, which is used to treat high blood pressure and heart failure.[18] This recall was due to N-nitrosodimethylamine being found in the recalled drugs.[19] Drugs containing NDMA exceeding the FDA's acceptable intake limits were recalled because "they pose[d] an unacceptable safety risk to patients."[20]

30.     The FDA announced that the NDMA found in valsartan drugs was caused by impurities in the manufacturing of some of the drugs and that not all valsartan drugs were being recalled.[21] Unlike the valsartan drugs, the NDMA found in Zantac is not due to impurities but is inherent to the molecular structure of ranitidine. In its citizen petition, Valisure stated that "[their] testing reveals NDMA so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself"[22] and that ranitidine produces NDMA by "reacting with itself."[23] Therefore, unlike some of the valsartan drugs, every dose of Zantac or its generic alternatives exposes users to high levels of the carcinogen NDMA.

**B.  Defendants Concealed the Risks of NDMA Exposure from Zantac**

31.     Defendants knew or should have known that Zantac exposes users to unsafe levels of NDMA. Nonetheless, none of the Defendants disclosed this information and the associated health risks to consumers, either by reporting it to the FDA or by alerting consumers on the drug's label.

---

[18] *FDA announces voluntary recall of several medicines containing valsartan following detection of an impurity, FDA* (Jul. 13, 2018), https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity
[19] *Id.*
[20] *Laboratory analysis of valsartan products,* FDA (current as of May 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products
[21] *FDA announces voluntary recall of several medicines containing valsartan following detection of an impurity, supra* footnote 55.
[22] Valisure Petition at 5.
[23] Valisure Petition at 2.

32.     A study that was published in 1983 suspected the carcinogenic nature of ranitidine in combination with nitrite (which is found in certain foods and produced by bacteria in the stomach).[24] Even though rats have a different gastric physiology from humans, the study concluded that "our experimental finds have shown that simultaneous oral administration in rats of high doses of ranitidine and NaNO2 [nitride] can produce DNA fragmentation either in liver or in gastric mucosa."[25]

33.     In 1983, an article discussed the toxicity of ranitidine. A group of scientists found that in hamsters, in vitro and under certain circumstances, ranitidine tends to form nitroso compounds (such as NDMA), which are DNA-damaging.[26]

34.     In 1987, after various studies came out discussing the concerns over ranitidine, Defendant GSK published a clinical study and determined that ranitidine was not associated with N-nitrosamines like NDMA.[27] However, this study had significant weaknesses.[28] GSK used a "less accurate and less specific detention method than industry standard chromatography, this method necessitated discarding all gastric samples that contained ranitidine. Thus, without ranitidine being present in any samples taken, the degradation products of ranitidine, like NDMA, could not reasonably be detected."[29] This was an obvious attempt by Defendant GSK to try to cover up the link between ranitidine and NDMA by not testing samples that contained ranitidine.

---

[24] Valisure Petition at 7.
[25] Brambilla, G. et al. *Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite.* Carcinogenesis v. 4,10  1281-1285 (1983) https://academic.oup.com/carcin/article-abstract/4/10/1281/2391364
[26] Annalisa Maura, et. al*., DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 Toxicology Letters 97 (August 1983), https://www.sciencedirect.com/science/article/abs/pii/0378427483900772?via%3Dihub
[27] Valisure Petition at 13.
[28] *Id.*
[29] *Id*. at 14.

35.     In 2003, a study proposed that "elevated levels of NDMA in drinking water produced by American wastewater treatment plans may be associated with the drug ranitidine."[30] Since then, multiple scientific groups and researchers have described "the breakdown of ranitidine to form NDMA during wastewater treatment."[31]

36.     A 2004 study examined and followed up on 414 patients with peptic ulcer over a period of 14 years. The study found that "those who were taking either Zantac or another antacid, Tagamet (cimetidine) had a heightened risk of bladder cancer."[32] The authors of the study also noted that "N-Nitrosamines are known carcinogens, and nitrate ingestion has been related to bladder cancer risk."[33]   NDMA is a type of N-Nitrosamine.

37.     In 2007, the Fred Hutchinson Cancer Research Center, a cancer institute established in 1972, conducted a peer-review study titled "Relationship between histamine2-receptor antagonist medications and risk of invasive breast cancer."[34] The study assessed the relationship between use of H(2) blockers – namely cimetidine, ranitidine, nizatidine, and famotidine and their relationship to breast cancer.[35] While the other H2 blockers did not have a link to breast cancer, ranitidine was linked with a 2.4-fold increased risk of hormone receptor-positive ductal carcinoma.[36]

---

[30] Valisure Petition at 5. *See* Mitch, W.a., Sharp, J.O., Trussell, R.R., Valentine, R.L., Alvarez-Cohen, L. and Sedlak, D.L. (2003) *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review.* Environmental Engineering Science. Vol 20, 5 https://superfund.berkeley.edu/pdf/231/pdf

[31] Valisure Petition at 5.

[32] Tanya Lewis, *What we know about the possible carcinogen found in Zantac*, Scientific American (Oct. 28, 2019), https://www.scientificamerican.com/article/what-we-know-about-the-possible-carcinogen-found-in-zantac/ citing Michaud DS, et. al., *Peptic Ulcer disease and the risk of bladder cancer in a prospective study of male health professionals*, 13 Cancer Epidemiology Biomarkers & Prevention 250 (February 2004), https://www.ncbi.nlm.nih.gov/pubmed/14973090

[33] *Id.*

[34] Robert W. Mathes, et. al., *Relationship between Histamine2- receptor antagonist medications and risk of invasive breast cancer*, 17 Cancer Epidemiology Biomarkers & Prevention 67 https://www.ncbi.nlm.nih.gov/pubmed/18199712

[35] *Id.*

[36] *Id.*

38.     A 2011 study that examined ranitidine in water supply found that "ranitidine, a histamine antagonist widely used for peptic ulcer treatment was found to be an important NDMA precursor."[37]

39.     A 2016 study conducted at Stanford University gave 10 volunteers 150 mg tablet of Zantac and discovered that the subsequent NDMA levels in their urine exceeded 47,000 nanograms.[38] The researchers wrote that as most of the NDMA would have been metabolized prior to reaching the urine, the amount of NDMA in the body could have actually been much higher.[39]

40.     As aforementioned, Valisure also conducted tests and discovered the link between ranitidine and NDMA formation during routine analysis of drug products in its pharmacy.[40] In its Citizen Petition, Valisure stated that "an epidemiological study ha[d] implicated ranitidine's drug class as being correlated to cancer."[41] Valisure tested ranitidine tablets by themselves and in conditions that stimulate the human stomach.[42] The results demonstrated "significant NDMA formation under simulated gastric conditions with [sodium] nitrite present."[43]

41.     Despite knowing that Zantac exposes users to unsafe levels of NDMA, Defendants did not notify or alert the FDA, even though manufacturers of an approved drug are required by law to submit an annual report to the FDA that contains a "brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product."[44]

---

[37] Julien Le Roux, Hervé Gallard, Jean-Philippe Croué. *Chloramination of nitrogenous contaminants (pharmaceuticals and pesticides): NDMA and halogenated DBPs formation.* 45 WATER RESEARCH 3164 (Mar. 26, 2011), https://hal-enpc.archives-ouvertes.fr/hal-01201554/document

[38] *What we know about the possible carcinogen found in Zantac, supra* footnote 68.

[39] *Id. citing*  Teng Zeng & William A. Mitch, *Oral intake of ranitidine increases urinary excretion of Nnitrosodimethylamine*, 37 Carcinogenesis 625 (Mar. 18, 2016), https://www.ncbi.nlm.nih.gov/pubmed/26992900

[40] Valisure Petition at 3.

[41] Valisure Petition at 4.

[42] Valisure Petition at 6.

[43] Valisure Petition at 7.

[44] 21 C.F.R. §314.81(b)(2).

42.     Manufacturers of an approved drug must also report "nonclinical laboratory studies" which include "copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the applicant concerning the ingredients in the drug product…"[45]

43.     Defendants were on notice about the harmful health effects of Zantac, chose to ignore the scientific evidence available to them, and concealed damaging information about Zantac from the FDA, such as the link between ranitidine and NDMA, thereby failing to comply with regulations put into place for the safety of the public.  In fact, instead of disclosing the link between Zantac and NDMA, Defendants chose to continue to manufacture, sell, and advertise Zantac to physicians, hospitals, pharmacies, and consumers as a safe drug for years.

44.     Consumers, including Plaintiff, relied on Defendants' material misrepresentations as to the safety of the drug. If Plaintiff had known of the risks of cancer and that he would get cancer by using Zantac or its generic alternatives, he would not have purchased or used the drug.

45.     Defendants, at the expense of Plaintiff's health and safety, continued to manufacture, sell, and profit off Zantac products. Therefore, Plaintiff now seek to recover his economic losses, costs of ongoing medical monitoring, and other available remedies as a result of his purchase and ingestion of Zantac.

## TOLLING ALLEGATIONS

### A.  The Discovery Rule

46.     Any applicable statute of limitations is tolled as a result of Defendants' acts and omissions alleged herein. Plaintiff, through no fault of his own, could not have discovered the

---

[45] 21 C.F.R. § 314.81(b)(2)(v).

nature of the cause of his cancer or that the use of Zantac could lead to cancer during the relevant time period.

47.     Plaintiff could not have discovered through the exercise of reasonable due diligence or know of any facts that would have caused him to suspect Defendants' deception within the applicable time, especially considering that the pertinent scientific research was published in scientific magazines that requires payment or subscriptions.

48.     As a result, the applicable statute of limitations did not begin to run until Plaintiff discovered Defendants' deception. As such, application of the discovery rule tolls the statute of limitations.

### B.  Fraudulent Concealment

49.     Defendants knowingly, actively, and affirmatively concealed the link between Zantac and excessive levels of NDMA and the risk of cancer associated with using Zantac during the relevant time period.

50.     Defendants are and were under a continuing duty to disclose the true character, quality, and risks associated with taking Zantac. Plaintiff reasonably relied on Defendants' active, knowing, and affirmative concealment.

51.     As a result, Defendants' fraudulent concealment prevented Plaintiff from discovering the nature of their claims against Defendants. As such, all applicable statutes of limitations have been tolled by Defendants' fraudulent concealment.

### C.  Estoppel

52.     Defendants are and were under a continuing duty to disclose the true character, quality, and risks associated with taking Zantac. Instead, Defendants chose to actively, knowingly, and affirmatively conceal the heightened exposure to NDMA and health risks associated with

using Zantac. Plaintiff reasonably relied on Defendants' misrepresentations about the safety of

Zantac and could not have reasonably known that he had been exposed to the aforementioned risks.

As a result, Defendants are estopped from asserting any statute of limitations defense in this matter.

## CLAIMS FOR RELIEF

### COUNT I
### STRICT PRODUCTS LIABILITY- DESIGN DEFECT

53.     Plaintiff incorporates by reference and realleges each preceding paragraph as

though fully set forth herein.

54.     In Florida, Defendants have a duty to use reasonable care to design a product that

is reasonably safe for its intended use in order to prevent defects that create a substantial risk of

foreseeable injury to consumers.

55.     Defendants breached their duty to use due care by creating Zantac, a drug that is

unreasonably dangerous for its normal and intended use. Additionally, Defendants breached their

duty of care by failing to disclose the defect to the Plaintiff, consumers, and the public in general.

56.     Due to the users' heightened exposure of NDMA when using Zantac, the drug is

inherently and unreasonably dangerous and is defective in design and/or formulation. The

ranitidine molecule, the active ingredient in Zantac, is unstable and can produce NDMA by

reacting with itself. As aforementioned, NDMA can lead to the development of cancer. Therefore,

as formulated and designed by Defendants, the foreseeable risks exceed the benefits of using

Zantac, and the drug is more dangerous than an ordinary consumer would expect.

57.     At all relevant times herein mentioned, Defendants designed, manufactured,

marketed, promoted, sold, supplied, and/or distributed Zantac and/or its generic alternatives.

58.     The design and/or formulation defect existed at the time the Zantac products left

Defendants' possession and the products reached the consumers without substantial change in the

condition in which it was produced, manufactured, and sold by the Defendants. Plaintiff used Zantac in a reasonably foreseeable manner

59.     At all relevant times, Defendants knew or should have known that Zantac was defective and unsafe based on the scientific research and studies conducted over the years.

60.     Plaintiff used Zantac as recommended and in a reasonably foreseeable manner to Defendants.

61.     Plaintiff's ingestion of the defective Zantac drug was the direct and proximate cause of Plaintiff's kidney cancer.

62.     As Defendants designed, researched, manufactured, tested, marketed, sold, and distributed the defective Zantac product, Defendants are strictly liable for Plaintiff's injuries as a result of his ingestion of Zantac.

Wherefore, Plaintiff seeks a trial by jury and all damages available to him under the law, including, but not limited to, pain and suffering, damages for his injuries, economic damages, and any other damages the Court deems appropriate.

## COUNT II
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

63.     Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

64.     At all relevant times herein mentioned, Defendants designed, manufactured, marketed, promoted, sold, supplied, and/or distributed Zantac and/or its generic alternatives.

65.     Defendants owed Plaintiff a duty to properly design, manufacture, test, inspect, label, market, examine, and provide proper and adequate warnings about the associated safety risks of using Zantac.

66.     At all relevant times, Defendants knew or should have known that Zantac was defective and unsafe based on the scientific research and studies conducted over the years.

67.     Defendants knew or should have known that Zantac creates serious health risks, such as cancer and could have avoided or reduced the foreseeable risks of harm to users by providing reasonable instructions or warnings. Defendants failed to exercise reasonable care to warn users and should have put proper warnings or instructions to adequately warn consumers of the associated health risks of using Zantac. Because of the inadequate warnings and instructions, Defendants' Zantac product is defective.

68.     The failure to warn defect existed at the time the Zantac products left Defendants' possession and the products reached the consumers without substantial change in the condition in which it was produced, manufactured, and sold by the Defendants. Plaintiff used Zantac in a reasonably foreseeable manner.

69.     Plaintiff's ingestion of the defective Zantac drug was the direct and proximate cause of Plaintiff's kidney cancer.

70.     Plaintiff, through the exercise of reasonable care, could not have discovered the defect in Zantac. If Defendants had disclosed the associated health risks of using Zantac, Plaintiff would not have bought and/or used Zantac.

71.     As Defendants designed, researched, manufactured, tested, marketed, sold, and distributed the Zantac product without the proper warnings and instructions, Defendants are strictly liable for Plaintiff's injuries as a result of his ingestion of Zantac.

72.     Defendants acted willfully, wantonly, and/or recklessly by failing to warn Plaintiff about Zantac's associated health risks by properly providing warnings and instructions on the label and by not designing the drug in a reasonably safe manner.

73.     Due to the foregoing acts and omissions by Defendants, Plaintiff has been injured and damaged in an amount to be proven at trial.

Wherefore, Plaintiff seeks a trial by jury and all damages available to him under the law, including, but not limited to, pain and suffering, damages for his injuries, economic damages, and any other damages the Court deems appropriate.

**COUNT III**
**NEGLIGENCE**

74.     Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

75.     Defendants owed Plaintiff a duty to exercise reasonable care in the designing, developing, manufacturing, testing, inspecting, distributing, labeling, and/or sale of Zantac.

76.     Defendants breached this duty of care as they negligently designed, developed, manufactured, tested, inspected, distributed, labeled, and/or sold Zantac.

77.     Plaintiff's injuries are the direct and proximate cause of the carelessness and negligence on part of the Defendants, including, but not limited to, the following:

a)     Negligence in the design, development, research, manufacture, testing, packaging, marketing, sale and/or distribution of Zantac;

b)     Negligence in failing to adequately warn Plaintiff, consumers, physicians, healthcare professionals, the public, and the FDA of the known and foreseeable health risks of ingesting Zantac;

c)     Negligence in failing to use reasonable care in the design, development, administration, and/or monitoring of the clinical trials of Zantac;

d)     Negligence in failing to use reasonable care in utilizing a reasonably safe design in the manufacturing of Zantac;

e)      Negligence in falsely representing that Zantac was safe for its intended purpose when Defendants knew the product was not safe;

f)      Negligence in failing to adequately test Zantac before and after its introduction to the market;

g)      Negligence in failing to warn Plaintiff and Plaintiff's physicians of the known or reasonably foreseeable risk of cancer when using Zantac;

h)      Negligence in failing to adequately and timely notify Plaintiff, consumers, physicians, healthcare professionals, the public, and the FDA of the associated cancer risks from ingesting Zantac;

i)      Negligence in failing to warn and update Plaintiff, consumers, physicians, healthcare professionals, the public, and the FDA with post-market warnings and instructions;

j)      Negligence in such further acts or omissions that may be proven at trial.

78.     Defendants knew or should have known that Plaintiff and other consumers would foreseeably suffer injury due to Defendants' failure to exercise reasonable and ordinary care.

79.     As a direct and proximate cause of Defendants' negligence, Plaintiff has suffered severe injuries, including but not limited to, developing kidney cancer. Plaintiff will endure continuous pain and suffering and economic loss as a result of Defendants' negligence. Plaintiff requires and/or will require additional medical care and treatment and will incur continuing expenses due to Defendants' actions and omissions.

80.     Due to the foregoing acts and omissions by Defendants, Plaintiff has been injured and damaged in an amount to be proven at trial.

Wherefore, Plaintiff seeks a trial by jury and all damages available to him under the law, including, but not limited to, pain and suffering, damages for his injuries, economic damages, and any other damages the Court deems appropriate.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

81.    Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

82.    Defendants, through their public announcements, press releases, public statements, the labelling on Zantac products, and promotional materials expressly warranted that Zantac was safe for its intended use of preventing and relieving heartburn associated with indigestion brought on by the consumption of certain foods and drinks.

83.    However, Zantac does not conform to the Defendants' warranties as it is unreasonably dangerous, defective in design and/or formulation, provides inadequate warnings of the adverse health risks associated with using Zantac, and is not fit for the ordinary purpose for which it was intended. Zantac has numerous serious side effects that were not mentioned or disclosed by Defendants, such as acting as a carcinogen to humans.

84.    Defendants knew or should have known that their representations and warranties about the safety of Zantac were false and misleading.

85.    Plaintiffs, as well as consumers, physicians, healthcare professionals, and the public relied on the express warranties made by Defendants.

86.    As a direct and proximate cause of Defendants' breach of their express warranties, Plaintiff has suffered severe injuries, including but not limited to, developing kidney cancer. Plaintiff will endure continuous pain and suffering and economic loss as a result of Defendants'

breach. Plaintiff requires and/or will require additional medical care and treatment and will incur continuing expenses due to Defendants' actions and omissions.

87.     Due to the foregoing acts and omissions by Defendants, Plaintiff has been injured and damaged in an amount to be proven at trial.

Wherefore, Plaintiff seeks a trial by jury and all damages available to him under the law, including, but not limited to, pain and suffering, damages for his injuries, economic damages, and any other damages the Court deems appropriate.

## COUNT V
## BREACH OF IMPLIED WARRANTY

88.  Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

89.  At all relevant times, Defendants are and/or were the manufacturers, distributors, marketers, and sellers of Zantac and knew or had reason to know of the specific intended use of the drug.

90.  At all relevant times, Defendants are and were merchants and sellers of goods.

91.  Plaintiff, who suffered from heart burn and indigestion, was a foreseeable user of Zantac.

92.  Defendants implicitly warranted that Zantac was in merchantable condition and fit for the ordinary purpose for which the drug is used.

93.  When designed, manufactured, sold, and at all times thereafter, Zantac was not in merchantable condition and was not fit for its ordinary purpose as it was defective and unreasonably dangerous to users.

94.  Defendants are not able to disclaim their implied warranty of merchantability as they knowingly sold an inherently defective and unreasonably dangerous drug.

95.   As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiff has suffered severe injuries, including but not limited to, developing kidney cancer. Plaintiff will endure continuous pain and suffering and economic loss as a result of Defendants' negligence. Plaintiff requires and/or will require additional medical care and treatment and will incur continuing expenses due to Defendants' actions and omissions.

96.   Due to the foregoing acts and omissions by Defendants, Plaintiff has been injured and damaged in an amount to be proven at trial.

Wherefore, Plaintiff seeks a trial by jury and all damages available to him under the law, including, but not limited to, pain and suffering, damages for his injuries, economic damages, and any other damages the Court deems appropriate.

## COUNT VI
## FRAUD OR FRAUDULENT CONCEALMENT

97.   Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

98.   Defendants intentionally and knowingly misrepresented, concealed, suppressed, and/or omitted material facts regarding the defectiveness and inherent dangerousness of Zantac. Defendants misrepresented to Plaintiff, consumers, physicians, healthcare professionals, and the public via their advertisements and drug packaging that Zantac was safe to use and did not have significant defects.

99.   When making these misrepresentations, Defendants knew that Zantac exposes users to unsafe levels of NDMA and heightened risks of cancer and chose to conceal it.  In fact, Defendants touted the benefits of using Zantac to the general public. Defendants knew or should have known that they should have disclosed the dangers associated with Zantac.

100.     Defendants knew and intended that Plaintiff would rely on such misrepresentations and omissions and that their concealment or failure to disclose the dangers associated with consuming Zantac would induce Plaintiff to recommend or use Zantac.

101.     Defendants knew that their concealment and suppression of the dangers of Zantac would allow them to continue selling Zantac and would result in increased revenue and profits. By not disclosing the fact that Zantac exposes consumers to high levels of NDMA or increases their risk of cancer, Defendants were able to keep users from switching to other widely available medications to treat their symptoms. Defendants acted maliciously, oppressively, and with intent to defraud.

102.     Defendants had a duty to disclose the inherent defects of Zantac as the information was material to Plaintiff since it concerned his safety and wellbeing and Defendants knew that Plaintiff could not reasonably discover this information on his own.

103.     Plaintiff and Plaintiff's healthcare providers detrimentally relied on Defendants' knowing, affirmative and active false representations, concealment, and omissions. Plaintiff could not have reasonably or through due diligence discovered the health risks associated with using Zantac or discovered that Defendants' representations were fraudulent and misleading

104.     As a direct and proximate cause of Defendants' negligence, Plaintiff has suffered severe injuries, including but not limited to, developing kidney cancer. Plaintiff will endure continuous pain and suffering in addition to economic loss as a result of Defendants' negligence. Plaintiff requires and/or will require additional medical care and treatment and will incur continuing expenses due to Defendants' actions and omissions.

105.     Due to the foregoing acts and omissions by Defendants, Plaintiff has been injured and damaged in an amount to be proven at trial.

Wherefore, Plaintiff seeks a trial by jury and all damages available to him under the law, including, but not limited to, pain and suffering, damages for his injuries, economic damages, and any other damages the Court deems appropriate.

## COUNT VII
## FRAUDULENT MISREPRESENTATION

106.    Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

107.    The Defendants falsely and fraudulently represented to Plaintiff, consumers, healthcare professionals, the public, and/or the FDA that based on test results, Zantac products were safe for consumption and were effective in relieving symptoms of acid reflux, heartburn, and other similar conditions.

108.    Unfortunately, Defendants representations were fraudulent and incorrect.

109.    At all relevant times, when Defendants made these representations about the safety of Zantac, they knew that their representations were fraudulent and proceeded to conceal and willfully and recklessly disregarded the truth about the dangers of using Zantac.

110.    Defendants intended that Plaintiff would rely on such misrepresentations and omissions. Defendants made the representations with the intent of defrauding Plaintiff, consumers, healthcare professionals, and the public into believing that Zantac was safe and therefore inducing them to recommend or use Zantac.

111.    Plaintiff and Plaintiff's healthcare providers detrimentally relied on Defendants' fraudulent misrepresentations and omissions. Plaintiff could not have reasonably or through due diligence discovered the health risks associated with using Zantac or discovered that Defendants' representations were fraudulent and misleading.

112.    Defendants knew or should have known that ranitidine was an unstable molecule that could react with itself to form unsafe levels of NDMA, which could lead to severe medical conditions such as cancer. Defendants deliberately turned a blind eye to the scientific research and studies that were available and minimized and concealed the inherently dangerous nature of Zantac from Plaintiff, consumers, healthcare professionals, and the public by making fraudulent misrepresentations about the safety and benefits of the drug.

113.    As a direct and proximate cause of Defendants' fraudulent misrepresentations, Plaintiff has suffered severe injuries, including but not limited to, developing kidney cancer. Plaintiff will have to endure continuous pain and suffering in addition to economic loss as a result of Defendants' immoral conduct. Plaintiff requires and/or will require additional medical care and treatment and will incur continuing expenses due to Defendants' actions and omissions.

114.    Due to the foregoing acts and omissions by Defendants, Plaintiff has been injured and damaged in an amount to be proven at trial.

Wherefore, Plaintiff seeks a trial by jury and all damages available to him under the law, including, but not limited to, pain and suffering, damages for his injuries, economic damages, and any other damages the Court deems appropriate.

## COUNT VIII
## NEGLIGENT MISREPRESENTATION

115.    Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

116.    Defendants negligently misrepresented, concealed, suppressed, and/or omitted material facts regarding the safety of Zantac to Plaintiff, consumers, physicians, healthcare professionals, and the public. Defendants intended that Plaintiff would rely on such misrepresentations and omissions.

117.   Defendants owed a duty to disclose the adverse side effects of using Zantac, such as the link between ranitidine and NDMA, the harmful effects of NDMA, and the potential of NDMA causing cancer, to Plaintiff, consumers, physicians, healthcare professionals, the public, and the FDA as Defendants had superior knowledge concerning the dangerous side effects of Zantac. Defendants breached this duty of care by failing to disclose the material fact that Zantac was unreasonably dangerous.

118.   Defendants, in the absence of due care, made misrepresentations and concealed the dangers of Zantac. Defendants knew and intended that Plaintiff would rely on such misrepresentations and omissions.

119.   Plaintiff and Plaintiff's healthcare providers detrimentally relied on Defendants' negligent or reckless misrepresentations and omissions. Plaintiff could not have reasonably or through due diligence discovered the health risks associated with using Zantac or discovered that Defendants' representations were fraudulent and misleading.

120.   As a direct and proximate cause of Defendants' negligence, Plaintiff has suffered severe injuries, including but not limited to, developing kidney cancer. Plaintiff will endure continuous pain and suffering in addition to economic loss as a result of Defendants' negligence. Plaintiff requires and/or will require additional medical care and treatment and will incur continuing expenses due to Defendants' actions and omissions.

121.   Due to the foregoing acts and omissions by Defendants, Plaintiff has been injured and damaged in an amount to be proven at trial.

Wherefore, Plaintiff seeks a trial by jury and all damages available to him under the law, including, but not limited to, pain and suffering, damages for his injuries, economic damages, and any other damages the Court deems appropriate.

## COUNT IX
## CLAIM FOR PUNITIVE DAMAGES

122.   Plaintiff incorporates by reference and realleges each preceding paragraph as though fully set forth herein.

123.   At all relevant times, Defendants had actual knowledge of the illegality and wrongfulness of their actions and knew that using Zantac could lead to cancer or other serious health risks.

124.   Defendants conduct shows their reckless disregard and indifference for the safety of Plaintiff and their consumers.

125.   Defendants knew that by misrepresenting, concealing, suppressing, and/or omitting the dangerous side effects of using Zantac, users, like Plaintiff, could develop severe medical conditions, such as cancer.  Despite this knowledge, Defendants willfully, wantonly, and recklessly continued to proceed with their conduct.

126.   Defendants willful, wanton, and/or reckless conduct includes, but is not limited to, Defendants' lack of disclosure and warnings of the link between ranitidine and NDMA and their failure to protect and take all reasonable measures to make sure that consumers such as Plaintiff were using defective medication that could cause cancer.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, respectfully requests that this Court enter judgment against Defendants, and award the following relief:

A.   An order awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering, health care costs, and medical monitoring;

B.   An order requiring Defendants pay both pre- and post-judgment interest on any amount awarded;

C.  Restitution for all purchases of Zantac by Plaintiff, in an amount to be determined at trial;

D.  An order awarding all actual, general, special, incidental, punitive, and consequential damages to which Plaintiff is entitled;

E.  An award of costs, expenses, and attorneys' fees as permitted by law; and

F.  Such other or further relief that this Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury, pursuant to Fed. R. Civ. P. §38(b) as to all claims in this action.

Dated: March 5, 2020.

Respectfully submitted,

**ZANER HARDEN LAW LLP**
1610 Wynkoop Street, Suite 120
Denver, Colorado 80202
Telephone: (303) 563-5354
Fax: (303) 563-5351

By:  */s/ Kurt Zaner*
KURT ZANER
Colorado Bar No.: 40989
Email:  kz@zanerhardenlaw.com

-  and -

**PODHURST ORSECK, P.A.**
SunTrust International Center
One SE Third Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 358-2800
Fax: (305) 358-2382

By:   */s/ Ricardo M. Martinez-Cid*
RICARDO M. MARTÍNEZ-CID
Florida Bar No. 383988
Email: RMCTeam@podhurst.com
LEA P. BUCCIERO
Florida Bar No. 84763
Email: RMCTeam@podhurst.com
*Attorneys for the Plaintiff*